# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMERICA BANK, a Texas Banking Association, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9707-CB |
| GLOBAL PAYMENTS DIRECT, INC., a New York Corporation, | ) ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| GLOBAL PAYMENTS COMERICA ALLIANCE, L.L.C., a Delaware Limited Liability Company, | ) ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: July 18, 2014
Date Decided: July 21, 2014

Daniel A. Dreisbach, Thomas A. Uebler and Sarah A. Clark of Richards, Layton & Finger, P.A., Wilmington, DE; Howard J. Roin and Laura R. Hammargren of Mayer Brown LLP, Chicago, Illinois, Attorneys for Plaintiff.

Peter B. Ladig, Meghan A. Adams and Kyle E. Gay of Morris James LLP, Wilmington, DE; John P. Brumbaugh and Claire Carothers Oates of King & Spalding LLP, Atlanta, GA, Attorneys for Defendant.

**BOUCHARD, C.**

# I.  INTRODUCTION

This action involves a business divorce.  In 1996, predecessors of plaintiff Comerica Bank ("Comerica") and defendant Global Payment Direct, Inc. ("Global" or "Global Direct") established a Delaware limited liability company called Global Payments Comerica Alliance, L.L.C. ("Alliance") to process credit and debit card transactions in a joint venture.  Comerica, a financial institution and a member of the Visa and MasterCard associations, agreed to refer merchants to Alliance exclusively.  Global, a payment processor, was to be the exclusive processor for Alliance.  These arrangements are reflected in a series of agreements the parties entered simultaneously when the joint venture began.

In October 2013, Comerica elected not to renew the parties' Service Agreement, which thus expired on January 31, 2014.  On May 14, 2014, Comerica exercised its right to dissolve Alliance.  Now, the parties are embroiled in a series of disputes as they work through the wind up of Alliance and Comerica seeks to transition its share of the merchant portfolio to a new payment processor.  Global asserts that Comerica remains bound by certain exclusivity obligations during the transition period.  Comerica seeks declaratory relief that, among other things, it is no longer bound by these obligations.  It also seeks the appointment of a liquidating trustee.  An expedited trial on these issues was held on July 14-15, 2014.

In this opinion, I conclude that the exclusivity and non-competition obligations in the parties' agreements, discussed in detail below, ended when the Service Agreement

1

terminated on January 31, 2014.  Comerica's request for a liquidating trustee will be addressed separately at a later date.

## II.  BACKGROUND[1]

### A.  The Parties

Plaintiff Comerica Bank is a Texas Banking Association with its principal place of business in Dallas, Texas.  It is a member of the Visa and MasterCard associations.

Defendant Global Payments Direct, Inc. is a New York corporation with its principal place of business in Atlanta, Georgia.  It is a provider of payment processing services.

Electronic payment processing involves a consumer acquiring goods or services from a merchant using an electronic method such as a credit card as the form of payment. A payment processor is the intermediary between the merchant, the credit card networks, and the banks that issue credit cards.  Visa and MasterCard, which are the largest card associations, require that a payment processor be sponsored by a member financial institution.  In this arrangement, a payment processor will route and clear transactions under the member bank's control through the Visa and MasterCard networks.

---

[1] The Pre-trial Stipulation and Order is cited as "PTO."  Joint trial exhibits are cited as "JX."  The trial transcript is cited as "Trial Tr."

### B. The Formation of Alliance and the Governing Agreements

On March 31, 1996, Comerica[2] and Global entered into a Limited Liability Company Agreement ("LLC Agreement") establishing Alliance as a joint venture to process credit and debit card transactions and provide related services.[3] Alliance provides these services to merchants in its merchant portfolio with whom it has made agreements.[4] Alliance's merchant customers are collectively referred to as the "Merchant Portfolio."

Alliance is a Delaware limited liability company. Comerica and Global have been its only two members during the time period relevant to this action, with Global holding a 51% membership interest and Comerica holding a 49% membership interest.[5] Alliance is managed by its two members, who act through designated Representatives. Global has three Representatives and Comerica has two Representatives.[6]

As part of their joint venture, Comerica and Global entered into additional agreements on and after March 31, 1996, including (1) Asset Purchase and Contribution

---

[2] The named parties to the LLC Agreement were Comerica Bank-Texas and Comerica Merchant Services, Inc., which are predecessors of Comerica, and National Data Payments Systems, Inc., which is now known as Global. PTO § II, ¶ 6. I refer to them as Comerica and Global, respectively, for simplicity.

[3] *Id.*

[4] JX 5 § 4.1.

[5] PTO § II, ¶ 4.

[6] *Id.* § II, ¶ 5.

Agreements dated March 31, 1996, December 31, 1996, and May 31, 2001 ("Contribution Agreements") and (2) Merchant Alliance and Service Agreements dated March 31, 1996 and May 31, 2001 ("Service Agreement").[7] In general terms, the Contribution Agreements set forth the terms by which Comerica contributed its merchant accounts to Alliance, and the Service Agreement sets forth specific services that Comerica and Global each would provide to each other and Alliance in connection with the joint venture. The Contribution Agreements and the Service Agreement are governed by Delaware law.[8]

## C. Key Provisions of the Service Agreement

Section 2 of the Service Agreement sets forth the services that Global and Comerica were obligated to provide to Alliance and each other.[9] Under that section, Global was obligated to furnish certain services listed in Exhibit A ("Global Direct Services"), which generally consist of payment processing services, and Comerica was obligated to furnish certain services listed in Exhibit C ("Comerica Services"), which

---

[7] The most recent comprehensive update of the Service Agreement is the Second Amended and Restated Merchant Alliance and Service Agreement dated May 31, 2001. JX 10. The parties agree that the language in Sections 15(a) and 15(d) of the Service Agreement, which are at the heart of the present dispute, was the same in the original March 31, 1996 version. PTO § II, ¶ 10.

[8] JX 11 § 13.9 (May 31, 2001 Contribution Agreement); JX 10 § 24(a) (May 31, 2001 Service Agreement).

[9] JX 10 § 2.

generally consist of bank sponsorship and transaction clearing services.[10]  The Global Direct Services and the Comerica Services, collectively, are defined in the Service Agreement as the "Services."[11]

The Service Agreement contains certain exclusivity obligations. Section 2 provides, in relevant part, that "[d]uring the term of this Agreement, Alliance [and Comerica] shall purchase all merchant processing services, including but not limited to the Global Direct Services, exclusively from Global Direct."[12]  Section 6(a) provides, in relevant part, that "[d]uring the term of this Agreement, [Comerica] agrees[s] to refer to Alliance, exclusively, potential merchants for Credit Card processing services."[13]

Section 15 of the Service Agreement is entitled "TERM, TERMINATION, AND TRANSITION ASSISTANCE."  Section 15(a) provides for automatic termination of the Service Agreement on January 31, 2014, unless the parties agree to a renewal:

> The parties agree that the term of [the Service Agreement] shall extend from the date hereof until [January 31, 2014].  The parties agree to enter into negotiations one year prior to termination regarding renewal but if the parties have not agreed to renew, this Agreement shall automatically terminate on the close of business on [January 31, 2014], subject to Section 15.d. hereof.[14]

---

[10] *See* JX 10 Exs. A, C.

[11] JX 10 § 2.

[12] JX 10 § 2.

[13] JX 10 § 6(a).

[14] JX 10 § 15(a).  The May 31, 2001 version of the Service Agreement automatically terminated on March 31, 2008.  *Id.*  Pursuant to an amendment dated as of February 9,

Section 15(d) of the Service Agreement is at the core of the parties' dispute in this action over whether Comerica remains bound by the exclusivity obligations in Sections 2 and 6(a) after January 31, 2014 for up to one year until such time as both parties no longer request Services from the other. It states as follows:

> In the event this Agreement terminates or otherwise expires, but a party hereto desires that either Global Direct or Comerica or their Affiliates continue to provide Services beyond the termination date, Global Direct and Comerica agree to extend this Agreement for a period of up to one (1) year on the same terms and conditions as expressed herein except that such party shall be obligated to purchase from Global Direct and/or Comerica or their Affiliates only such Services as such party shall specify from time to time. Global Direct or Comerica Bank, as applicable, shall have the right to adjust the fees set forth on Exhibit B or Exhibit D, as applicable, to reflect commercially reasonable market rates.

## D.     Key Provisions of the Contribution Agreements

The Contribution Agreements provide that Comerica will not compete with Alliance by soliciting processing business from the merchants in the Merchant Portfolio.[15] These non-competition obligations end (1) upon "the earlier of the date of termination or expiration of the [LLC] Agreement" or "dissolution" of Alliance in the

---

2007, the parties extended the automatic termination date to January 31, 2014. JX 10 at COMERICA000885.

[15] JX 7 § 13.9(a) (March 31, 1996 Contribution Agreement); JX 9 § 9.4 (December 31, 1996 Contribution Agreement) (providing that the covenants contained in § 13.9 of the March 31, 1996 Contribution Agreement generally "shall remain in full force and effect and are hereby incorporated by reference"); JX 11 § 9.5(a) (May 2001 Contribution Agreement).

case of the first two Contribution Agreements,[16] and (2) "as of the earlier of the date of termination or expiration of the . . . Service Agreement," "the acquisition by one Member of another Member's Membership interest in Alliance," or "the dissolution of Alliance" in the case of the third Contribution Agreement.[17]

### E. Key Provisions of the LLC Agreement

Section 18.1.5 of the LLC Agreement defines an "Optional Sale Event" to mean, among other things, the expiration or termination of the Service Agreement.[18] When an Optional Sale Event occurs, one member (denominated the "Purchasing Member") has an option to negotiate for the purchase of the other member's interest in Alliance and, if that option is not exercised, "the Purchasing Member shall have the right to elect to cause [Alliance] to be dissolved and liquidated pursuant to Section 21."[19]

Section 18.4.4 of the LLC Agreement provides that in any Optional Sales Event, "upon consummation of the sale or dissolution, as applicable, there shall be no restrictions on the ability of either party to obtain processing services."[20]

---

[16] JX 7 § 13.9(a) (March 31, 1996 Contribution Agreement); JX 9 § 9.4 (December 31, 1996 Contribution Agreement).

[17] JX 11 § 9.5(a) (May 31, 2001 Contribution Agreement).

[18] JX 5 § 18.1.5(c)-(d).

[19] JX 5 §§18.1.1, 18.1.2, 18.1.3; *see also id*. § 21.1.5.

[20] JX 5 § 18.4.4. This provision contains an exception for an Optional Sale Event pursuant to Section 18.1.5(e). Global did not argue that this exception applies.

7

Section 21 of the LLC Agreement governs dissolution. It provides that Alliance "shall be dissolved and its affairs wound up . . . [u]pon the occurrence of a[n] . . . Optional Sale Event pursuant to Article 18 and the decision of the Member entitled to make the purchase to dissolve [Alliance]."[21] Section 21 further provides that "[u]pon the dissolution of [Alliance], the Members shall wind up [Alliance]'s affairs in accordance with the Delaware Act" and that the "Members are authorized to take any and all actions contemplated by the Delaware Act," including, without limitation, to settle and close Alliance's business, distribute Alliance's assets (in particular, the Merchant Portfolio) and provide for Alliance's liabilities.[22] After payment of known liabilities and reserving for contingent or unforeseen liabilities, any remaining proceedings are to be distributed to the members in accordance with their respective percentages in Alliance.[23]

The principal asset of Alliance is the Merchant Portfolio. During the wind up process, the Merchant Portfolio is to be divided by "mutual decision" of the members or, in the absence of agreement, pursuant to a stipulated formula and then distributed "in kind" in accordance with the members' 51/49 percent interests in Alliance.[24]

---

[21] JX 5 §§ 21.1, 21.1.5.

[22] JX 5 § 21.3.1.

[23] JX 5 § 15.4.

[24] JX 5 § 15.5.

### F. Events Leading to the Filing of the Complaint

On October 22, 2013, Comerica advised Global in writing that it would not renew the Service Agreement, but intended to assert its rights under Section 15(d) to request that "certain provisional and other continuation services" be provided "for a yet to be determined period of time not to exceed one year past the expiration date of the agreement."[25] On November 8, 2013, Global responded, acknowledging the request for continued services and taking the position that Comerica's exclusivity obligations under the Service Agreement "will continue to apply during any such transition period, regardless of which party is requesting the transition services."[26]

On January 24, 2014, Global confirmed its understanding that the Service Agreement "will terminate on January 31, 2014," and that the parties would "enter a transition period" for up to twelve months. Global also requested that Comerica continue to provide Services, as defined in the Service Agreement, under Section 15(d) of the Service Agreement.[27] Global reiterated its position that Comerica's exclusivity obligations "will continue to apply for so long as either Global Direct . . . or Comerica desires for the other to provide Services" under the Service Agreement.[28]

---

[25] PTO § II, ¶ 13; JX 13.

[26] JX 16.

[27] PTO § II, ¶ 14; JX 23.

[28] JX 23.

9

The parties have stipulated that an Optional Sale Event occurred under the LLC Agreement on or before January 31, 2014.[29] After January 31, 2014, Global increased the fees it charges for the Global Direct Services significantly.[30]

On May 14, 2014, Comerica informed Global in writing that "Comerica has elected to dissolve the Alliance."[31] The parties have stipulated that "Alliance is in dissolution, and the Members are now to wind up Alliance pursuant to the LLC Agreement and the Delaware Act."[32]

On May 15, 2014, as part of a larger proposal, Global proposed a division of the Merchant Portfolio for those merchants that were part of the Merchant Portfolio as of April 30, 2014.[33] On May 27, 2014, Comerica agreed to Global's proposed division of the Merchant Portfolio, but not the remaining parts of Global's proposal.[34]

On June 19, 2014, after the complaint in this action was filed and I granted Comerica's motion for expedition, Comerica sent a letter to Global delineating a series of things it wanted Global to do as part of Alliance's wind up to assist with the migration of

---

[29] PTO § II, ¶ 17.

[30] Trial Tr. at 61.

[31] JX 59; *see also* PTO § II, ¶ 18.

[32] PTO § II, ¶ 20.

[33] PTO § II, ¶ 22.

[34] PTO § II, ¶ 23. Comerica and Global stipulated, for purposes of trial, that the division of the Merchant Portfolio set forth in Global's May 15, 2014 letter "shall be the division of the Merchant Portfolio." *Id*. § II, ¶ 24.

Comerica's share of merchant accounts to a new processing entity.[35]  Comerica asserted in that letter that Global was obligated to provide the assistance sought under Section 18.5 of the LLC Agreement.  That provision provides, in relevant part, that to facilitate the distribution of Alliance's property, the members agreed to "execute and deliver such assignments, instruments and documents as may be reasonably requested . . . to transfer the merchant agreements (and the full benefit and burdens thereof)" to the other member.[36]

## G.    Procedural History

On May 28, 2014, Comerica filed its complaint in this action asserting five claims for relief.  In Count I, Comerica seeks a judicial declaration that: (1) the Service Agreement terminated on January 31, 2014; (2) the January 31, 2014 termination was an "Optional Sales Event," which entitled Comerica to dissolve Alliance; and (3) Comerica properly dissolved Alliance on May 14, 2014.  In Count II, Comerica seeks a judicial declaration that:

(1)    All of Comerica's exclusivity obligations in the Service Agreement to Alliance or Global ended upon termination of the Service Agreement, and Comerica may refer merchants to its new processing venture;

(2)    All non-competition obligations in the Contribution Agreements ended upon Alliance's dissolution or the termination of the Service Agreement;

---

[35] JX 76.

[36] JX 5 § 18.5.

11

(3)    There are no restrictions on Comerica's ability to obtain processing services from entities other than Global; and

(4)    Comerica is entitled to establish its new processing venture and compete with Global and Alliance.

In Count III, Comerica requests that the Court appoint a liquidating trustee under 6 *Del. C.* § 18-803(a) to divide Alliance's Merchant Portfolio in an equitable manner as required under Section 15.5 of the LLC Agreement. In Counts IV and V, Comerica seeks damages against Global for allegedly unwarranted fee increases that Global imposed for the Global Direct Services after the Service Agreement was terminated on January 31, 2014. Count IV is asserted as a direct claim for harm Comerica allegedly has suffered and Count V is asserted derivatively on behalf of Alliance.

On May 28, 2014, Comerica moved for expedited proceedings and a trial by mid-July 2014. In its motion, Comerica argued that, without expedited relief, it would be irreversibly prevented from transitioning to a new competitive business venture to process transactions during the governing agreements' transition period. On June 5, 2014, I granted the motion for expedition and ordered that a trial be held on July 14-15, 2014, limited to Counts I-III.

In their pre-trial stipulation, the parties agreed that no witness would be called to testify concerning the negotiation of the LLC Agreement, the Contribution Agreements and the Service Agreement.[37] In that stipulation, Comerica requested that the Court

---

[37] PTO § VIII, ¶ 1.

12

accelerate its consideration of the exclusivity issues, claiming that it was "being severely prejudiced by its inability to use a different processor and to refer new customers to its new competing business."[38]

Trial was held on July 14-15. After trial, the parties were permitted to make additional submissions concerning the exclusivity issues underlying Counts I-II and oral argument was held on those issues on July 18, 2014. This is my decision on Counts I-II. Count III will be addressed separately at a later time.

## III. ANALYSIS

Under the Delaware Declaratory Judgment Act, 10 *Del. C.* §6501, *et seq.,* Delaware courts "have power to declare rights, status and other legal relations whether or not further relief is or could be claimed."[39] In Counts I-II, Comerica seeks a series of declarations concerning the meaning of the Service Agreement, LLC Agreement and Contribution Agreement. For purposes of analysis, I organize these declarations into three categories: (1) the termination of the Service Agreement and dissolution of Alliance, (2) Comerica's exclusivity obligations under the Service Agreement and (3) Comerica's non-competition obligations under the Contribution Agreements.

---

[38] PTO § IX, ¶ A.

[39] 10 *Del. C.* § 6501.

13

## A. The Termination of the Service Agreement and Dissolution of Alliance

In Count I, Comerica seeks a declaration that the Service Agreement terminated on January 31, 2014, and that Comerica properly dissolved Alliance on May 14, 2014.[40]

Section 15(a) of the Service Agreement provides that it will "automatically terminate" on January 31, 2014, "if the parties have not agreed to renew."[41] On October 22, 2013, Comerica advised Global in writing "that it would not renew the Service Agreement."[42] On January 24, 2014, Global sent Comerica a letter acknowledging that the Service Agreement "will terminate on January 31, 2014."[43] Thus, I find that the Service Agreement terminated on January 31, 2014.

In their pre-trial stipulation, the parties stipulated that "Comerica dissolved Alliance" on May 14, 2014. Global reiterated in its pre-trial brief its agreement that "Alliance is dissolved."[44] At trial, Global never contended that Comerica's dissolution of Alliance was improper. Thus, I find that Comerica properly dissolved Alliance on May 14, 2014.

---

[40] Count I also sought a declaration that the January 31, 2014 termination of the Service Agreement was an "Optional Sales Event" entitling Comerica to dissolve Alliance. Because Global did not contest this point at trial, Comerica dropped its request for such a declaration. Thus, I do not decide this issue.

[41] JX 10 § 15(a).

[42] PTO § II, ¶ 13; JX 13.

[43] JX 23; PTO § II, ¶ 14.

[44] Def.'s Pre-Trial Br. 1.

Global argues Count I is moot because it has never disputed that "Alliance was properly dissolved" and that "whether or not the Service Agreement terminated on January 31, 2014, the parties do not dispute that the Service Agreement was extended pursuant to Section 15(d), and the parties' respective rights during the 'extended' period are the subject of Count II."[45] Because Global's position concerning the termination of the Service Agreement on January 31, 2014 is stated equivocally, and because the declarations sought in Count I are integral to Count II, I decline to dismiss Count I as moot and will enter judgment providing the declarations sought in Count I.

## B. Comerica's Exclusivity Obligations

### 1. The Parties' Contentions

Sections 2 and 6(a) of the Service Agreement require Comerica to purchase all merchant processing services exclusively from Global (Section 2) and to refer to Alliance, exclusively, potential merchants for credit card processing services (Section 6(a)) "[d]uring the term" of the Service Agreement. These are the only exclusivity obligations in the Service Agreement the parties have identified in this case.

Section 15(d) of the Service Agreement, which is at the heart of the parties' dispute concerning whether Comerica remains bound by any exclusivity obligations after the termination of the Service Agreement, states as follows, with the key language in dispute in bold:

> In the event this Agreement terminates or otherwise expires, but a party hereto desires that either Global Direct or Comerica or their Affiliates

---

[45] Def.'s Pre-Trial Br. 22.

continue to provide Services beyond the termination date, Global Direct and Comerica *agree to extend this Agreement* for a period of up to one (1) year *on the same terms and conditions as expressed herein* except that such party shall be obligated to purchase from Global Direct and/or Comerica or their Affiliates only such Services as such party shall specify from time to time. Global Direct or Comerica Bank, as applicable, shall have the right to adjust the fees set forth on <u>Exhibit B</u> or <u>Exhibit D</u>, as applicable, to reflect commercially reasonable market rates.[46]

Relying on Section 15(d), Global argues that, if one party asks the other to continue to provide Services after the termination of the Service Agreement, then the Service Agreement is extended and *all* of its "terms and conditions" – including the exclusivity obligations in Section 2 and 6(a) – continue to apply except for the two terms specifically mentioned in Section 15(d), namely that (1) the parties no longer need to purchase all Services from each other and instead can purchase them *a la carte* and (2) the parties can raise their fees "to reflect commercially reasonable market rates." According to Global, any other interpretation would read the phrase "on the same terms and conditions" out of Section 15(d) and would leave "the parties in a state of uncertainty as to which other provisions of the Service Agreement no longer apply."[47]

Comerica argues that the exclusivity obligations in Sections 2 and 6(a) of the Service Agreement expired on January 31, 2014, when the Service Agreement was terminated, because those provisions only apply "[d]uring the term of" the Service Agreement. Regarding the language in Section 15(d) in bold above, Comerica argues

---

[46] JX 10 § 15(d) (emphasis added).

[47] Def.'s Pre-Trial Br. 24.

that the January 31, 2014 expiration of Sections 2 and 6(a) are among the "terms" of the Service Agreement and thus there is no inconsistency in finding that the exclusivity obligations expired when the Service Agreement was terminated and the requirement in Section 15(d) that the "same terms and conditions" in the Service Agreement remain in place during the transition period that follows the expiration of the Service Agreement.

Comerica further argues that its construction is consistent with other agreements the parties entered as part of a single transaction and that Global's construction is not. Comerica focuses, in particular, on Section 21.3.1(b) of the LLC Agreement, which provides for a wind up period upon dissolution that requires the "closing [of] the company's business,"[48] and Section 18.4.4, which states explicitly that "upon consummation of the sale or dissolution … there shall be no restrictions on the ability of either party to obtain processing services."[49]

### 2. Consideration of the Other Agreements

A threshold issue presented by the need to interpret Section 15(d) is whether to construe the Service Agreement in isolation or in the context of the parties' larger contractual relationship. Global argues that the Court should look at the terms of the Service Agreement in isolation, based on an integration clause in Section 24(b) of the Service Agreement, which states as follows:

[48] JX 5 § 21.3.1(b).

[49] JX 5 § 18.4.4.

This Agreement contains the full understanding of the parties with respect to the subject matter hereof, and no waiver, alteration or modification of any of the provisions hereof, shall be binding unless in writing and signed by officers of all parties.[50]

Comerica argues that the LLC Agreement and Service Agreement should be read together and points out that the integration clause in the LLC Agreement acknowledges the inter-relatedness of these two agreements (and other agreements) the parties entered simultaneously. The integration clause in the LLC Agreement states, as follows:

This Agreement, together with the Contribution Agreement, the Services Agreement, the Merchant Alliance Agreement (the "Other Agreements") and any Exhibits to this Agreement or to any of the Other Agreements constitutes the entire agreement of the parties with respect to matters set forth in this Agreement and the Other Agreements ….[51]

In my view, this is as an appropriate circumstance in which to apply the rule that contemporaneous contracts between the same parties concerning the same subject matter should be read together as one contract.[52] The original version of the Service Agreement

---

[50] JX 10 § 24(b).

[51] JX 5 § 24.7.

[52] *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1251 (Del. Ch. 2010) ("Because the two agreements are intertwined, the wisdom of the rule that related agreements are to be read together is apparent . . . ."); *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *7 (Del. Ch. Oct. 19, 2000) ("Because the Indemnification Agreement was entered into for all relevant purposes contemporaneously with the Declaration of Trust, the two instruments in this case must be viewed together and in their entirety when determining the scope and nature of the indemnification arrangements between Simon and the Fund."); *Crown Books Corp. v. Bookstop Inc.*, 1990 WL 26166, at *1 (Del.Ch. Feb. 28, 1990) ("[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters . . . ."); *see also* 17A C.J.S.

was entered simultaneously with LLC Agreement, on or about March 31, 1996, and the language in dispute in Section 15(d) was included in the original version of the Service Agreement.[53] Both of these agreements are inter-related and indisputably constitute parts of an integrated transaction concerning the same overall subject matter along with other contracts the parties entered simultaneously, including the Contribution Agreement. The integration clause in the LLC Agreement reflects this reality.

I also do not read the integration clause in the Service Agreement to negate the wisdom of reading related agreements together in the present circumstances. The integration clause in the Service Agreement expresses that the Service Agreement "contains the full understanding of the parties with respect to the *subject matter hereof*."[54] The subject matter of the Service Agreement, however, concerns one area of subject matter that is part of the larger, overall relationship between the parties reflected in the collection of agreements that Comerica and Global entered simultaneously.

More specifically, the subject matter of the Service Agreement generally concerns the terms under which each party will provide services to each other and to Alliance. The

---

*Contracts* § 401 (2014); 11 Richard A. Lord, *Williston on Contracts* § 30:26, at 239-42 (4th ed. 1999) ("[T]he principle that all writings which are part of the same transaction are interpreted together also applies when incorporation by reference of another writing may be inferred from the context surrounding the execution of the writings in question."); Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

[53] PTO § II, ¶¶ 6, 9-10.

[54] JX 10 § 24(b) (emphasis added).

Service Agreement does not address a variety of other subject matters relevant to the parties' relationship, such as the terms and conditions for dissolving and winding up Alliance,[55] which is addressed in detail in the LLC Agreement. Nor does the Service Agreement *explicitly* address the existence or lack of any restrictions on the parties' ability to use other processors after their joint venture has ended,[56] a subject which is addressed explicitly in the LLC Agreement. Thus, I believe it is appropriate to consider the terms of the LLC Agreement and other related agreements when construing Section 15(d) of the Service Agreement.

### 3. Construction of Section 15(d)

"When interpreting a contract, the court's ultimate goal is to determine the shared intent of the parties."[57] "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein,"[58] in order "not to

---

[55] Although the Service Agreement does not address the subject of Alliance's dissolution, it does contain two provisions concerning the division of the Merchant Portfolio that may occur upon the dissolution of Alliance. *See* JX 10 §§ 18(p), 20(d).

[56] Global's argument that the exclusivity provisions in Sections 2 and 6(a) of the Service Agreement were extended is not based on any provision *explicitly* addressing the issue of exclusivity. As explained above, Global's argument is based instead on an inference that the parties intended to extend such obligations through the operation of Section 15(d), which speaks generally about extending the "same terms and conditions" of the Service Agreement.

[57] *Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *10 (Del. Ch. Aug. 23, 2010).

[58] *In Re National Intergroup, Inc. Rights Plan Litigation*, 1990 WL 92661, at *6 (Del. Ch. July 3, 1990); *see also Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977); *Stemerman v. Ackerman*, 184 A.2d 28, 34 (Del. Ch. 1962).

render any part of the contract mere surplusage,"[59] and, "if possible, reconcile all the provisions of the instrument."[60]  In that regard, "[t]he meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[61]  Applying these principles, I decline to adopt Global's construction of Section 15(d) for three reasons.

First, Global's interpretation of Section 15(d) of the Service Agreement creates irreconcilable conflicts with the parties' other agreements.  The plain import of Section 18.4.4 of the LLC Agreement, quoted above, is that Comerica not be restricted from obtaining processing services from wherever it wanted to upon the dissolution of Alliance.[62]  But, under Global's interpretation of Section 15(d), the exclusivity

---

[59] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010).

[60] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[61] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[62] Global never disputed the import of Section 18.4.4 when opposing expedition or in any of its pre-trial or post-trial submissions.  During post-trial argument, Global argued for the first time that Section 18.4.4 could be construed to apply only "upon consummation" of the dissolution because the lack of processing restrictions in Section 18.4.4 is triggered "upon consummation of the sale or dissolution."  JX 5 § 18.4.4.  When questioned, Global could not say whether (or not) the dissolution of Alliance already had been "consummated."  Post-Trial Oral Argument Tr. at 26 (July 18, 2014).  The text of Section 18.4.4 is ambiguous whether the phrase "upon consummation" was intended to apply to a "sale" or to both a "sale" and "dissolution."  I find it significant that Section 18.4.4 does not refer to a wind up period or condition its application "upon consummation" of the wind up process even though both the LLC Agreement and the Delaware Limited Liability Company Act carefully distinguish between an event of dissolution and the wind up period.  The LLC Agreement provides that, "[u]pon dissolution of [Alliance], the Members shall wind up [Alliance]'s affairs in accordance with the Delaware Act."  JX 5

21

obligations in Sections 2 and 6(a) would extend past the date of Alliance's dissolution. Similarly, Global's interpretation is incompatible with Section 21.3.1(b) of the LLC Agreement, which provides for a wind up period upon dissolution that requires the "closing [of Alliance]'s business."[63] It is difficult to fathom how, as a practical matter, one could close Alliance's business while simultaneously being required to continue referring merchants to Alliance and processing with Global exclusively until the very end of the transition period contemplated by Section 15(d).

Similarly, Global's interpretation of Section 15(d) creates a conflict with the provision of the Contribution Agreement permitting Comerica to compete with Alliance and solicit business from the Merchant Portfolio upon the earlier of the termination of the Service Agreement or dissolution of Alliance.[64] This provision would be negated if Section 6(a) of the Service Agreement was extended beyond January 31, 2014, when the Service Agreement was terminated, because Section 6(a) generally requires Comerica to refer potential merchants to Alliance exclusively for credit card processing services.

Second, whether the Service Agreement is construed in isolation or in conjunction with the parties' other agreements, I do not believe that the language at issue in Section 15(d) is unambiguous. The phrase "same terms and conditions" in Section 15(d) would

§ 21.3.1. The Delaware Act sets forth the circumstances whereby "[a] limited liability company *is dissolved* and its affairs shall be wound up." 6 *Del. C.* § 18-802 (emphasis added). Thus, I construe Section 18.4.4 to apply upon the event of dissolution, which occurred here on May 14, 2014.

[63] JX 5 § 21.3.1(b).

[64] *See supra*. at 6-7.

22

be extraneous if it was intended to extend the Service Agreement (with the two exceptions noted) in its entirety. That result could have been achieved simply by stating that the parties "agree to extend this Agreement." Thus, inclusion of the phrase "same terms and conditions" in Section 15(d) may have been intended (as I believe it was) to convey that some but not all of the terms and conditions of the Service Agreement would be extended if either party sought Services from the other during the transition period.

Moreover, as discussed further below, the purpose of Section 15(d) is to allow the parties to provide each other Services – a defined term – during a transition period. It is illogical that the parties would chose to extend obligations unrelated to the provision of Services indirectly through the general language of Section 15(d), particularly when they directly and expressly provided for the extension of other obligations of this nature beyond the termination of the Service Agreement in other places of the agreement but did not do so in Sections 2 or 6(a).

For example, Sections 18(n) and (o), which generally prohibit either party from recruiting the other party's employees who provided services to Alliance, expressly state that those obligations shall remain in force "[d]uring the term of this Agreement and for a period of two (2) years thereafter."[65] Similarly, Section 20(d), which concerns the ownership of Alliance's proprietary and confidential information upon a division of the Merchant Portfolio, states explicitly that "[t]he provisions of this section shall survive

---

[65] JX 10 §§ 18(n)-(o).

termination of this Agreement for a period of three years."[66]  These provisions directly and clearly delineate the intended post-termination duration of obligations unrelated to providing Services during the transition period and, in my view, undermine the notion that the drafters of the Service Agreement intended to extend the exclusivity obligations in Sections 2 and 6(a) by operation of Section 15(d), much less that they intended to do so in such a peculiar way, *i.e.*, that exclusivity would continue if, and only if, and only for so long as, one party requests Services from the other during the transition period.

Third, Global's construction cannot be squared with the evident purpose of Section 15(d), which is to afford the parties a period of time after termination of the Service Agreement to provide each other "transition assistance" so that, in the case of Comerica, it can move its share of the Merchant Portfolio to a new processor and, in the case of Global, it can establish a relationship with a new financial institution to continue processing its share of the Merchant Portfolio. I use the term "transition assistance" advisedly.  Section 15, which has eight subsections, is titled "TERM, TERMINATION, AND TRANSITION ASSISTANCE."[67]  Subsection 15(d) is the only part of Section 15 that addresses the issue of transition,[68] which Global readily conceded.[69]

---

[66] JX 10 § 20(d).

[67] Unlike the LLC Agreement, *see* JX 5 § 24.3, the Service Agreement does not contain a provision suggesting that captions may not be used for purposes of interpretation.

[68] The other seven subsections in Section 15 address the term of the Service Agreement (subsection a), when either party can terminate the Service Agreement before the expiration of its term (subsections b, c and g), certain obligations arising "prior to the effective date of termination" (subsection e), certain automatic events of termination

Global's interpretation of Section 15(d), in my view, would frustrate the transitional purpose of Section 15(d). During trial, the parties testified that there are essentially two methods by which Comerica can transition its share of the Merchant Portfolio to a new processor, through a one-time, *en masse* migration of data (the preferred method) or piecemeal (either merchant-by-merchant or in groups of merchants).[70] The continued operation of the exclusivity obligations, would impede both of these methods because, among other things, the Merchant Portfolio must be divided before Comerica's share can be migrated to a new processor and because of the technological complexities of migrating data between two different processors who may be (and in this case are) using different systems.[71]

In the case of an *en masse* migration, the trial testimony convinces me it would not be feasible to instantaneously finalize the split of merchants and "flip the switch" to begin processing with a new processor at the precise moment when the exclusivity obligations would expire under Global's interpretation of Section 15(d), *i.e.*, the earlier of such time that neither party is providing any Services or January 31, 2015. A piecemeal migration is equally problematic. It necessarily contemplates having Comerica use two different processors for some period of time but the continued application of the exclusivity

(subsection f) and certain rebate obligations for failing to meet performance standards (subsection h).

[69] Post-Trial Oral Argument Tr. at 21 (July 18, 2014).

[70] Trial Tr. at 138, 152.

[71] Trial Tr. at 292–93.

obligations in Sections 2 and 6(a) would prevent Comerica from do so during the transition period. [72]

In opposing expedition, Global readily acknowledged that "requiring Comerica to use Global as its exclusive processor frustrates a transition to Comerica's new processing venture" but claimed that this frustration would be "fully consistent with the parties' intention."[73] If it really was the parties' intention to frustrate Comerica's ability to transition to a new processor through the extension of the exclusivity obligations in Sections 2 and 6(a), or otherwise, I would have expected to see some parol evidence from the parties' negotiations to support this assertion. [74] Global offered no such evidence at trial.

For all the foregoing reasons, I reject Global's construction of Section 15(d). I now turn to Comerica's position.

As explained above, Comerica argues that the exclusivity obligations in Sections 2 and 6(a) terminated on January 31, 2014, because those two provisions only apply "[d]uring the term" of the Service Agreement, and that this condition was simply one of the "terms and conditions" of the Service Agreement. The logical extension of this

---

[72] Trial Tr. at 138 (Chayt) (saying of a piecemeal migration "The [exclusivity] restrictions haven't enabled us to do that.").

[73] Def.'s Opp'n to Mot. to Expedite at 19 (internal quotations omitted).

[74] Of course, if that really was the parties' intention, it could have been achieved clearly and directly by drafting Sections 2 and 6(a) to apply during the term of the Service Agreement and for a period of X years thereafter. *See supra*. at 23-24.

argument is that all of the provisions in the Service Agreement limited in duration to apply "during the term of this Agreement" became automatically inoperative when the Service Agreement was terminated on January 31, 2014, and were not extended during the transition period.

Global points out that a number of provisions containing the "during the term of this Agreement" limitation are "necessary to perform Services during the transition period," including provisions governing the parties' use of each other's names and logos on various documents (Sections 7(a)-(b)), clearing arrangements with Card associations (Section 13), cash advances (Section 14), insurance (Section 17) and access to debit card settlement systems (Section 18(k)). [75] According to Global, "both parties have continued to perform under and with the benefit of these terms" and the "ability of the parties to provide Services in the transition period depends on the continued efficacy of these provisions."[76]

Global raises a valid point. Absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract.[77] Thus, I do not agree with Comerica's construction of the Service Agreement

---

[75] Def.'s Pre-Trial Br. 26.

[76] *Id*. 27.

[77] *Wilmington Trust Co. v. Pryor*, 25 A.2d 685, 686 (Del. Ch. 1942) ("In the absence of other explanatory language, the natural inference, therefore, is that that word has the same meaning throughout the sentence."); 28 Richard A. Lord, *Williston on Contracts* § 32:6 ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons."); *see also Medicis*

because it would lead to the illogical result that certain provisions of the Service Agreement necessary to perform Services during the transition period would have expired on January 31, 2014, and become inoperative during the transition period.

In my opinion, based on all the considerations discussed above, the most reasonable and logical construction of Section 15(d) is that the parties intended when they used the phrase "same terms and conditions" in Section 15(d) to extend beyond the termination of the Service Agreement those terms and conditions of the Service Agreement necessary to perform the Services, if any, that either party requests from the other during the transition period, with the further understanding that either party could request Services *a la carte* and raise the fees they charge "to reflect commercially reasonable market rates."[78]   Applying this construction, the exclusivity obligations in Section 2 and 6(a) expired on January 31, 2014, the end of the term of the Service Agreement, and were not extended by operation of Section 15(d), because those obligations are not necessary to providing Services during the transition period and because Sections 2 and 6(a) expressly state that those obligations apply only "[d]uring the

---

*Pharm. Corp. v. Anacor Pharm., Inc.*, 2013 WL 4509652, at \*7 (Del. Ch. Aug. 12, 2013) ("In the absence of anything indicating a contrary intent, it is a general rule of construction that where the same word or phrase is used on more than one occasion in the same instrument, and in one instance its meaning is definite and clear and in another instance it is susceptible of two meanings, there is a presumption that the same meaning was intended throughout such instrument.") (citation omitted); *In re Mobilactive Media, LLC*, 2013 WL 297950, at \*19 & n.211 (Del. Ch. Jan. 25, 2013) *reargument denied*, 2013 WL 1900997 (Del. Ch. May 8, 2013) (same).

[78] JX 10 § 15(d).

28

term" of the Service Agreement. By contrast, those provisions of the Service Agreement that are necessary to a party's ability to perform any of the Services that the other party has requested for the transition period were extended and remain in place until the transition period ends. This is the case even if a provision contains the "during the term of this Agreement" limitation, such as the ones Global has identified, where such provision is necessary to perform Services during the transition period.

The foregoing construction is consistent, in my view, with the context and purpose of Section 15(d), which is to afford both parties the opportunity to receive assistance from the other in the form of Services for a limited period of time so that they each can transition out of the joint venture to new processing arrangements. Comerica can transition its share of the Merchant Portfolio to a new processor while Global can establish a relationship with a new financial institution to continue to process its share of the Merchant Portfolio. Equally significant, the foregoing construction reconciles the Service Agreement with each of the provisions in the LLC Agreement and the Contribution Agreements, discussed above.[79] Because Sections 2 and 6(a) of the Service Agreement terminated on January 31, 2014, there is no conflict with Sections 18.4.4 or 21.3.1(b) of the LLC Agreement or the provision of the Contribution Agreements terminating the non-competition obligations therein.

Based on the foregoing, Comerica has established that the exclusivity obligations in Sections 2 and 6(a) terminated on January 31, 2014, and that there are no restrictions in

---

[79] *See supra*. at 22-23.

the Service Agreement on Comerica's ability to obtain processing services from entities other than Global. Judgment will be entered providing these declarations.[80]

### C. Comerica's Non-Competition Obligations

As part of Count II, Comerica seeks a declaration that "[a]ll non-competition obligations in the Contribution Agreements ended on May 14, 2014, due to Alliance's dissolution, and/or on January 31, 2014, with the termination of the Service Agreement."[81] As discussed above, although the various Contribution Agreements contain slightly different phrasing, they each provide that Comerica's obligations not to compete end upon the earlier of the date of termination of the LLC Agreement or the dissolution of Alliance.[82] Global has not specifically opposed Comerica's request for declaratory relief concerning the Contribution Agreements. Because I have found that the Service Agreement was terminated on January 31, 2014, I will enter judgment declaring that the non-competition obligations in the Contribution Agreements ended on that date.

---

[80] The declarations contained in the implementing Order accompanying this Memorandum Opinion address the parties' contractual relationship, which was the subject of Counts I-II. These declarations do not address issues outside of the parties' contractual relationship, such as fiduciary obligations that may be owed to Alliance, which have not been presented to the Court and on which I express no views.

[81] This is the manner in which Comerica phrased this declaration after trial in its proposed form of order.

[82] *See supra*. at 6-7.

## IV. CONCLUSION

For the foregoing reasons, judgment is entered in Comerica's favor on Counts I and II of the Verified Complaint. An implementing Order accompanies this Memorandum Opinion.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMERICA BANK, a Texas Banking Association, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9707-CB |
| GLOBAL PAYMENTS DIRECT, INC., a New York Corporation, | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| GLOBAL PAYMENTS COMERICA ALLIANCE, L.L.C., a Delaware Limited Liability Company, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## ORDER AND PARTIAL FINAL JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED this 21st day of July, 2014, for the reasons stated in my July 21, 2014 Memorandum Opinion, that:

1.      Defined terms have the meaning set forth in the Memorandum Opinion.

2.      Judgment is entered in favor of Comerica and against Global on Counts I and II of the Verified Complaint.

3.      The Service Agreement terminated on January 31, 2014.

4.      Comerica properly dissolved Alliance on May 14, 2014.

5.      All of Comerica's exclusivity obligations under Sections 2 and 6(a) of the Service Agreement to Alliance or Global ended on January 31, 2014, when the Service

Agreement terminated, and Comerica was thereafter entitled to refer its merchants to its new processing venture and to purchase processing services from other merchant processors.

6. All non-competition obligations in the Contribution Agreements ended on January 31, 2014, with the termination of the Service Agreement.

7. There are no contractual restrictions on Comerica's ability to obtain processing services from entities other than Global.

8. Finding no just reason for delay, the Court, under Rule 54(b), directs the entry of final judgment on Counts I and II of the Verified Complaint.

_____
Chancellor